Filed 10/5/20  S.I. v. Superior Court CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| S.I.,<br><br>Petitioner,<br><br>v.<br><br>THE SUPERIOR COURT OF KERN COUNTY,<br><br>Respondent;<br><br>KERN COUNTY DEPARTMENT OF HUMAN SERVICES,<br><br>Real Party in Interest. | F081306<br><br>(Super. Ct. No. JD139612-00)<br><br><br>**OPINION** |

---

### THE COURT[*]

ORIGINAL PROCEEDINGS; petition for extraordinary writ review.  Harry A. Staley, Judge.  (Retired judge of the Kern County Sup. Ct. assigned by the Chief Justice pursuant to art. VI, § 6 of the Cal. Const.)

Kimberly J. Savage for Petitioner.

No appearance for Respondent.

Margo A. Raison, County Counsel, and Bryan C. Walters, Deputy County Counsel, for Real Party in Interest.

---

[*]      Before Levy, Acting P.J., Detjen, J. and Franson, J.

-ooOoo-

Petitioner, S.I. (mother), seeks an extraordinary writ from the juvenile court's orders issued at a contested 12-month review hearing (Welf. & Inst. Code, § 366.21, subd. (f))[1] in June 2020 terminating her reunification services and setting a section 366.26 hearing for October 14, 2020, as to her now three-year-old son, P.E. P.E.'s father, D.E. (father), also filed a writ petition, which is pending in this court in our case No. F081305. Mother contends the court denied her due process by not continuing the hearing and by conducting it telephonically. She further contends there was insufficient evidence to find it would be detrimental to return P.E. to her custody, that the Kern County Department of Human Services (department) provided her reasonable reunification services and that there was not a substantial probability P.E. could be returned to her custody. We deny the petition.

## PROCEDURAL AND FACTUAL SUMMARY

*Relinquishment and Detention*

Mother gave birth to P.E., her fourth child, in March 2017 in Las Vegas, Nevada. Two of her children were in legal guardianship with relatives and one was deceased. On March 27, 2019, mother relinquished custody of P.E. to J. Garces, the maternal stepgrandmother, on the condition Garces file for legal guardianship. However, Garces could not take care of P.E. and, on April 5, 2019, she relinquished custody to the department, who placed him in foster care in Bakersfield.

Garces reported she had legal guardianship of mother's oldest child, a six-year-old daughter, and was in the process of adopting her. Mother dropped the child off with her when the child was 14 months old and never returned for her. Garces' nephew had legal guardianship of mother's then three-year-old son. Garces said mother took care of her

---

[1] Statutory references are to the Welfare and Institutions Code unless otherwise noted.

children until they were about two years of age and then placed them in the custody of family members. Mother gave her P.E. in the parking lot of an apartment complex in Las Vegas. Mother had her fifth child with her at the time, a newborn daughter. Mother asked Garces to keep P.E. for two weeks until she received her welfare check and income tax refund. Garces said mother contacted them for money "all the time." Garces said P.E. was dirty and smelled, he had " 'black stuff underneath his toe nails' " and his dreadlocks were " 'tangle[d], dry and stunk[.]' " Mother gave her a backpack with diapers that did not fit him but no clothes. There were no signs P.E. had been physically abused. Garces wanted to take care of P.E. but was 70 years old and could not care for a two year old.

Garces said mother was "constantly moving." The year before she lived in Ohio, Sacramento, California and Las Vegas, Nevada. Mother used " 'pot and speed' " and was " 'skinny as a rail' " when she dropped P.E. off with her. Mother was not upset when she said goodbye to P.E. She showed Garces her newborn, turned away and walked off. The only information Garces could provide about father was that he was an inmate in a Nevada state prison.

The department filed a dependency petition on P.E.'s behalf, under section 300, subdivision (g) (no provision for support), alleging mother's whereabouts were unknown and father was incarcerated. Father was serving a prison sentence for possession of a stolen vehicle.

The juvenile court ordered P.E. detained and found mother's whereabouts were unknown. The court ordered the department to offer mother services pending its disposition of the case, including weekly supervised visits. The department offered mother counseling for parenting/child neglect and random drug and alcohol testing. If mother produced a confirmed positive drug test, she was to enroll in substance abuse counseling.

*Disposition*

Mother appeared at the jurisdictional hearing on April 29, 2019, by court call from Las Vegas. The court continued the hearing to May 29, 2019. Mother did not appear at the continued hearing but was represented by counsel, who objected to the juvenile court exercising jurisdiction. The court sustained the allegation in the petition and set the dispositional hearing for June 18, 2019.

The dispositional hearing was not conducted until November 14, 2019, after multiple continuances. Neither parent appeared at any of the hearings in the interim. Mother was represented, but father was not until July 2019 when he was deemed P.E.'s presumed father.

Esmeralda Lopez, the social worker assigned P.E.'s case, mailed mother a case plan letter to her home in Sacramento, California, informing her of her case plan requirements and intent to locate a drug testing center near her and provide her that information. On September 19, 2019, Lopez attempted to contact mother by telephone to discuss drug testing in her county. Unable to reach her by phone, she sent her a letter, giving her the assigned pin number and telephone number of the testing laboratory. She gave her the telephone number of the Sacramento County Department of Child, Family and Adult Services and encouraged her to call and get additional information. She also provided mother information for court-approved parenting and child neglect classes near her.

On October 29, 2019, Lopez talked to mother by telephone about her case plan. Mother was enrolled in a parenting class but had not started the class because she was working. She said she used "weed weeks ago," but had been "clean for weeks now." She said she was tested for her job and tested negative. Lopez told her the letter she sent her with the names of providers for a parenting class had been returned. Mother gave her an additional address in Sacramento and said she lived off and on between two addresses. Mother said she visited P.E. by video chat or telephone every day from Monday through

4.

Thursday. On October 31, Lopez texted mother her pin number for the drug testing hotline. Mother advised Lopez that she received the pin number and called in but did not have to test that day.

On November 12, 2019, Lopez spoke to a staff member from Concerta Urgent Care in Sacramento where mother was referred for drug testing. Mother tested the Friday before, November 8, and had come in again but the staff member needed clarification about authorization for testing. Lopez advised the staff member to test her and explained how the cost was billed to the department through National Toxicology.

By the time of the dispositional hearing, mother had not participated in any of the services offered at detention or visited P.E. The department recommended the juvenile court transfer the case to Sacramento County.

Neither parent appeared at the dispositional hearing on November 14, 2019. Minor's counsel objected to transferring the case. The juvenile court exercised its dependency jurisdiction, ordered P.E. removed from parental custody and ordered the parents to participate in counseling for parenting/child neglect and mother to submit to random drug testing. If she received a confirmed positive result for a controlled substance, her case plan required her to enroll in substance abuse counseling. The court set the six-month review hearing for May 14, 2020. Father was released from custody five days after the dispositional hearing.

In January 2020, mother moved to Las Vegas. Lopez or a representative continued to contact her at least once a month concerning her case plan either by face-to-face contact, letter or telephone call.

*Six-Month Review Hearing*

Neither parent was present at the six-month review hearing on May 14, 2020. The department's recommendation was to terminate reunification services and set a section 366.26 hearing. Mother's attorney requested a contested video hearing, which the juvenile court set for June 16, 2020.

In its report for the six-month review hearing, the department informed the juvenile court mother started counseling for parenting in February 2020 and attended four of the six required sessions. She informed Lopez on March 17, 2020, that the parenting class was cancelled because of the COVID-19 pandemic. She failed to appear for drug testing from November 2019 to March 2020. She was excused for failing to drug test in January because she was moving to Las Vegas.

On May 14, 2020, Lopez asked mother whether she participated in a substance abuse assessment. Mother said she had not because her insurance would not pay for it and she had not been paid yet. Mother said she had been calling in to drug test but missed testing the preceding Monday because she was in jail. That same day, Lopez sent mother a letter confirming that she was enrolled in a parenting class at Parenting Project through King Bridge Community Center in Las Vegas. Lopez asked mother whether the classes were suspended because of the pandemic or if she was able to participate in classes on-line. She asked mother to request a progress report. Lopez identified Concerta Medical as mother's testing facility and gave her the assigned pin number. She reminded mother that she was asked to drug test on May 8 but did not because of work. She was asked to test on May 9, but Lopez had not talked to her to know if she tested. She asked mother to complete a substance abuse assessment and gave her the telephone number of Choices Group, LLC (Choices Group) to make an appointment. She also suggested mother call the local child protective services for assistance in locating a provider that accepted her insurance.

On May 20, 2020, mother told Lopez she was not able to drug test on May 9 because she was not on the list to test at the testing facility. She was supposed to drug test on May 11 but was not able to test. Lopez asked her why she did not test on May 12. Mother explained she did not know she was supposed to test that day. Mother contacted Rudy at Choices Group and was waiting for a call back. She could pay the $187 cost for the substance abuse assessment.

6.

On May 21, 2020, mother told Lopez she spoke to Rudy from Choices Group regarding a substance abuse assessment and he said she needed a referral from the department. Lopez spoke to a staff member from Choices Group named Karen who stated she needed a letter. Lopez faxed a letter that same day and told mother to call and set up an intake appointment. Father registered in parenting counseling in April 2020 in Las Vegas. He did not register sooner because he was employed, and his work scheduled prevented it.

On June 10, 2020, Lopez received an email regarding three negative drug test results from samples provided by mother in Sacramento on November 8, December 12 and December 17, 2019. However, the test results were not issued by the National Toxicology, Inc., the only drug testing service approved by the department.

The department recommended the juvenile court terminate reunification services based on the parents' minimal progress in their case plans and irregular visitation. They only had one face-to-face visit with P.E. on March 14, 2020. Father told Lopez he called P.E. every Monday, Tuesday and Friday at 5:00 p.m., but sometimes the caretaker was busy and unavailable. The caretaker reported the parents often called together, but she preferred they call separately. She observed that P.E. was not very responsive during the video visits and that his attention span was short. However, he greeted his parents. P.E. was doing well in her home and she was willing to adopt him if the parents failed to reunify.

*Combined Contested Six- and 12-Month Review Hearing*

By the time the juvenile court conducted the contested six-month review hearing on June 16, 2020, it had been 15 months since P.E. was removed from the parents' physical custody. Consequently, the court conducted a combined contested six- and 12-month review hearing.

*Parents' Request for Continuance*

The parents appeared by telephone represented by counsel at the combined contested hearing. Father's attorney informed the juvenile court that she had her first contact with father that morning. One of the issues was whether he had regular visits with P.E. and father sent her 51 or more texts showing he had video visits with P.E. on a regular basis. She requested a brief continuance to verify his contacts.

Counsel for the department objected to a continuance, pointing out that the parties conferred the evening before about whether the matter should be contested. That morning, the department provided an updated phone number for the parents that was provided to counsel. Counsel for the department asserted that visitation was only one requirement for continuing the hearing to the 18-month review hearing and opined there was insufficient evidence to find a substantial probability P.E. would be returned to parental custody by then. She also pointed out that father and the caretaker were available by telephone and could testify about visitation. Minor's counsel objected to the continuance. Mother's attorney joined in the request for a continuance, stating mother also had evidence of video visits to offer. Father's counsel disagreed she indicated the matter would not be contested. She expected it to could go forward as a telephonic contested hearing but after receiving the new evidence, she did not feel prepared to proceed.

The juvenile court did not find good cause to continue the hearing and denied the requests.

*Mother's Testimony*

Mother moved to Las Vegas in January 2020 but not to live with father. She moved in with him a month before the hearing. She completed four of the six required parenting classes. Mother completed nine of the 16 parenting classes in Sacramento but had to start parenting classes again when she moved to Las Vegas. She would have completed the parenting class in April if the pandemic had not broken out. She learned

8.

how children react and how the parent should react to the child, how to give them attention and regard them and how they learn at different ages.

Mother started drug testing in January 2020 but did not have physical copies of the test results. She called in to drug test every day and only had to drug test four times. She provided the test results to Lopez but did not know the results. She had no reason to believe they would be positive. She was not enrolled in substance abuse counseling. She still needed a referral to complete a substance abuse assessment and was able to pay for it.

Initially, mother did not visit P.E. while she lived in Sacramento because she did not have transportation. Later, Lopez arranged for her to visit P.E. by bus, which she did. Her last in-person visit was on March 14, 2020. She was not able to visit after that because of the pandemic. She visited P.E. by video chat and by telephone. She did not know how many video calls she had with P.E. but was scheduled Monday through Thursday at 6:00 p.m., and visited most of the time. She did not miss any telephone calls. She was with father during some of his visits.

Mother was arrested in May 2020 in Long Beach for possession of a gun. She was in Long Beach for her stepson's birthday. Father was with her when she was arrested. She did not attempt to see P.E. while she was in Long Beach because she was told in-person visits were not offered at that time.

*Father's Testimony*

Father completed four of the six parenting classes. He expected to complete one of the remaining two classes on July 2 and was on a waiting list for the other. He visited P.E. by telephone or video Monday through Wednesday at 5:00 p.m. He initially had difficulty making all his calls because of his work schedule. He told his social worker and the caretaker he was having difficulty but neither accommodated his schedule. P.E. recognized him and called him "Dad." P.E. was overjoyed when he saw father. P.E.

9.

talked on average about eight minutes and sometimes did not interact with father, instead playing with his toys. However, father watched him engage in his other activities.

Father visited P.E. on November 27, 2019, 14 times in December 2019, 12 times in January 2020, seven in February, 14 in March, 17 in April, 13 in May and six times in June. Mother also participated in some of the video visits. Approximately five times the caretaker did not answer the phone.

*Lopez's Testimony*

Father contacted Lopez in November 2019 when he was released from custody. Since then she had contact with him at least once a month except January 2020. She arranged video and telephonic visitation for him. In-person visits were not arranged at that time because father said he could not come to Bakersfield because he was not familiar with the area. She offered him a bus ticket from Barstow to Bakersfield but not from Las Vegas. Father never told her electronic visitation was difficult because of his work schedule. She did not believe father had a telephone visit prior to December 14 and did not know if he had any video visits. She had no record of speaking to father about visits in January 2020, but he told her in February he was visiting three times a week. She was not able to verify that.

Lopez confirmed that Choices Group received her letter regarding substance abuse counseling for mother. She informed a staff member the department would not pay for it and mother would have to apply through her insurance carrier. The staff member said Choices Group did not accept mother's insurance but would see her if she paid at the time of service. Lopez did not know if mother completed an assessment or exactly how much it cost. She received several amounts ranging from $175 to $187.

*Caretaker's Testimony*

P.E. had been in the caretaker's care for a year and a few months. She kept records of the parents' visitation. Mother generally visited separately from father in the beginning. Most of the visits occurred over Facebook Messenger. Mother visited

10.

13 times in December and father did not participate in any of those visits but visited separately, four times. P.E. had difficulty during visits because he was autistic, and he struggled with speech. In January 2020, mother visited 13 times and father visited three times. Mother visited seven times in February and father visited four times. In March, mother visited 18 times. Father was present for some of mother's 18 visits and visited seven times along with mother. Mother visited 15 times in April, father visited six times and they participated in the other's visits. Mother visited six times in May but did not have a working phone during that month, so they used father's phone. Father visited seven times in May, and they participated in the other's visits.

*Argument and Ruling*

Counsel for the department argued the parents' failure to participate regularly in their case plan was prima facie evidence it would be detrimental to return P.E. to their custody. She also argued there was insufficient evidence to support a finding he could be returned to their custody by October 5, 2020, the 18-month limitation on reunification services. Mother's attorney argued for continued services based on Lopez's failure to adequately assist mother in accessing her services and mother's demonstrated ability to complete her services plan. Father's attorney argued he was not provided reasonable visitation and that he demonstrated the ability to complete his case plan. Minor's counsel argued the court should find the parents did not make sufficient progress in their case plans or demonstrate the capacity and ability to complete their services plans and terminate reunification services.

The juvenile court found it would be detrimental to return P.E. to parental custody and the department provided them reasonable reunification services, but their progress was minimal. The court also found there was not a substantial probability P.E. could be returned to their custody with additional time, terminated reunification services and set a section 366.26 hearing.

11.

*Due Process*

Mother contends the juvenile court violated her right to due process by denying her request for a short continuance and by conducting the hearing by telephone. We disagree.

Due process requires "a 'hearing appropriate to the nature of the case.' " (*In re James Q.* (2000) 81 Cal.App.4th 255, 265, quoting *Mullane v. Cent. Hanover Bank & Trust Co.* (1950) 339 U.S. 306, 313.) Although due process is "a flexible concept which depends upon the circumstances and a balancing of various factors," it generally requires the right to present relevant evidence. (*In re Jeanette V.* (1998) 68 Cal.App.4th 811, 817.) This means parents are entitled to be heard in a meaningful manner. (*In re James Q.*, at p. 265; *In re Crystal J.* (1993) 12 Cal.App.4th 407, 412) [parents whose rights will be impacted entitled to be heard].) However, "[t]he state's strong interest in prompt and efficient trials permits the nonarbitrary exclusion of evidence [citation], such as when the presentation of the evidence will 'necessitate undue consumption of time.' (Evid. Code, § 352.) The due process right to present evidence [therefore] is limited to relevant evidence of significant probative value to the issue before the court." (*Maricela C. v. Superior Court* (1998) 66 Cal.App.4th 1138, 1146−1147.)]

Section 352 governs continuances in juvenile dependency matters. Subdivision (a) of section 352 provides in part:

> "(1) Upon request of counsel for the parent, guardian, minor, or petitioner, the court may continue any hearing under this chapter beyond the time limit within which the hearing is otherwise required to be held, provided that a continuance shall not be granted that is contrary to the interest of the minor. In considering the minor's interests, the court shall give substantial weight to a minor's need for prompt resolution of his or her custody status, the need to provide children with stable environments, and the damage to a minor of prolonged temporary placements. [¶]
> (2) Continuances shall be granted only upon a showing of good cause and

12.

only for that period of time shown to be necessary by the evidence presented at the hearing on the motion for the continuance."

In April 2020, the Judicial Council issued emergency rules to address the use of remote and telephonic hearings in response to the COVID-19 global pandemic. Emergency rule 3 authorizes courts to require that judicial proceedings and court operations be conducted remotely, "in order to protect the health and safety of the public, including court users, both in custody and out of custody defendants, witnesses, court personnel, judicial officers, and others …." (Emergency rule 3(a).) A remote proceeding under the rule "includes, but is not limited to, the use of video, audio, and telephonic means for remote appearances; the electronic exchange and authentication of documentary evidence; e-filing and e-service; the use of remote interpreting; and the use of remote reporting and electronic recording to make the official record of an action or proceeding." (Emergency rule 3(a)(3).)

We review the juvenile court's denial of a continuance for abuse of discretion; discretion is abused when a decision is arbitrary, capricious or patently absurd and results in a manifest miscarriage of justice. (*In re D.Y.* (2018) 26 Cal.App.5th 1044, 1056.)

Mother contends the juvenile court abused its discretion because it denied her the ability to produce evidence of the frequency of her visitation with P.E. By denying a continuance and by conducting the hearing telephonically, she asserts, the juvenile court "seriously crippled [her] ability to effectively put on … [evidence,] present supporting evidence, and cross-examine and impeach the social worker with proposed exhibits and evidence."

We cannot say that the juvenile court abused its discretion. First, mother was not prejudiced by the court's decision not to continue the hearing. She was able to testify concerning how often she visited P.E. She said she had video visits four days a week and participated in most of the available visits and did not miss any telephone calls. Her testimony was bolstered by the caretaker who kept a record of mother's visits and gave a

13.

monthly count. For the most part, her testimony coincided with mother's estimate that she participated in most of the 16 available monthly video visits. To the extent mother disagreed with the caretaker's recorded number of visits, her attorney had an opportunity to examine the caretaker. Further, continuing the hearing even for a short time for mother to produce documentary evidence of her visits did not serve P.E.'s best interest. He had been out of mother's custody for over a year and had not visited her in person for most of that time. Given the unlikely circumstance that he would reunify with her, there was no reason to postpone permanency for him.

We conclude mother was provided a meaningful opportunity to present relevant evidence regarding visitation. Therefore, no violation of her right to due process occurred. We also conclude the juvenile court did not abuse its discretion in denying her request to continue the hearing.

*Detrimental Return*

Mother contends the juvenile court erred in finding it would be detrimental to return P.E. to her custody because the department did not articulate its reasons for concluding that P.E. would be at risk of harm in her care.

At each review hearing, "there is a statutory presumption that the child will be returned to parental custody." (*In re Marilyn H*. (1993) 5 Cal.4th 295, 308.) A court, therefore, must return the child to parental custody at the 12-month review hearing unless it finds by a preponderance of the evidence that doing so would "create a substantial risk of detriment to the safety, protection, or physical or emotional well-being of the child." (§ 366.21, subd. (f)(1).) It is the department's burden to prove the child would face some actual, nonspeculative risk if returned to parental custody. (*In re Yvonne W*. (2008) 165 Cal.App.4th 1394, 1400.)

"In evaluating detriment, the juvenile court must consider the extent to which the parent participated in reunification services. [Citations.] The court must also consider the efforts or progress the parent has made toward eliminating the conditions that led to

the child's out-of-home placement." (*In re Yvonne W.*, *supra*, 165 Cal.App.4th at p. 1400.)

A parent's failure to participate regularly and make substantive progress in court-ordered treatment programs constitutes prima facie evidence that return would be detrimental. (§ 366.21, subd. (f)(1).) Technical compliance with court-ordered services, though significant, is not conclusive evidence a parent does not pose a risk of detriment to his or her child. It simply means there was not prima facie evidence of detriment. The court must still consider whether the parent eliminated the conditions leading to the child's removal and whether the child would be safe in parental custody. (See, e.g., *In re Dustin R.* (1997) 54 Cal.App.4th 1131, 1141−1142.)

We review a juvenile court's detriment finding for substantial evidence. " ' "Substantial evidence" is evidence of ponderable legal significance, evidence that is reasonable, credible and of solid value. [Citation.]' [Citation.] 'Inferences may constitute substantial evidence, but they must be the product of logic and reason. Speculation or conjecture alone is not substantial evidence.' " (*Tracy J. v. Superior Court* (2012) 202 Cal.App.4th 1415, 1424.)

Mother does not argue the evidence is insufficient to support a finding of detriment. She simply argues the juvenile court's finding is error because the department did not address detriment in its report and, therefore, the court did not have evidence to support its finding. As a reviewing court, we can affirm the court's finding if it is supported by substantial evidence. (*In re B.S.* (2012) 209 Cal.App.4th 246, 252.) We conclude such evidence exists on this record.

The risk of detriment, in this case, was mother's pattern of abandoning her children without provision and the possibility she was using drugs. When she left P.E. with the maternal stepgrandmother in March 2019, she was reportedly as " 'skinny as a rail.' " The following October, she told Lopez she used marijuana but had discontinued its use. Throughout the 15-month period of reunification, mother failed to comply with

the requirement that she drug test, despite repeated prompting by Lopez. Consequently, the question of whether she had a substance abuse problem was unanswered. Further, she failed to obtain a substance abuse assessment, which would have either obviated the need for drug testing or provided the department information to assist her in addressing her substance abuse problem. Given mother's failure to participate in random drug testing, the court could find prima facie evidence it would be detrimental to return P.E. to her custody.

*Reasonableness of Services*

Mother contends the department misrepresented her drug testing results in November 2019, did not credit her for the negative results in November and December 2019 and failed to help her obtain a substance abuse assessment even though Lopez knew she was having difficulty completing that requirement of her case plan. We disagree.

Reunification services are intended to facilitate the return of a dependent child to parental custody. (*In re T.G.* (2010) 188 Cal.App.4th 687, 696−697.) The adequacy of a reunification plan and the department's efforts are judged according to the circumstances of each case. (*Robin V. v. Superior Court* (1995) 33 Cal.App.4th 1158, 1164.) To support a finding reasonable services were offered or provided, "the record should show that the supervising agency identified the problems leading to the loss of custody, offered services designed to remedy those problems, maintained *reasonable* contact with the parents during the course of the service plan, and made *reasonable* efforts to assist the parents in areas where compliance proved difficult .…" (*In re Riva M.* (1991) 235 Cal.App.3d 403, 414.)

In determining whether services were reasonable and appropriate to the individual, we look at the totality of the services offered or provided. (*In re Mario C.* (1990) 226 Cal.App.3d 599, 604−605.) "In almost all cases it will be true that more services could have been provided more frequently and that the services provided were imperfect. The standard is not whether the services provided were the best that might be provided in an

ideal world, but whether the services were reasonable under the circumstances." (*In re Misako R.* (1991) 2 Cal.App.4th 538, 547.)

On a challenge to the juvenile court's reasonable services finding, we view the evidence in a light most favorable to the respondent, indulging all legitimate and reasonable inferences to uphold the verdict. (*In re Misako R.*, *supra*, 2 Cal.App.4th at p. 545.) If substantial evidence supports the juvenile court's finding, we will not disturb it. (*Ibid.*)

Mother's reunification plan required her to participate in random drug testing and complete a substance abuse assessment if she produced a confirmed positive drug test result. Lopez provided mother information to access the drug testing services in Sacramento and Las Vegas and consulted with her at least once a month to find out if she was complying and to assist her. Yet, by the 12-month review hearing, she had not participated in any drug tests through the department's authorized drug testing services. Consequently, sometime around May 2020, Lopez asked mother to participate in a substance abuse assessment through Choices Group. Choices Group required a letter authorizing the assessment, which Lopez provided. Mother, however, was required to pay for the assessment. There is no explanation in the record why mother and not the department had to pay for the assessment. In any event, mother had the means to pay for it.

On appeal, mother contends there is a conflict in the record as to whether she tested on November 12, 2019. It states that she failed to test that day but also states that she went to the testing facility, which prompted the call from the staff member to Lopez and Lopez's explanation of the billing process. There does not appear to be a conflict, however, because the staff member did not say he tested mother. Further, the dates the department alleged mother missed drug tests, including November 2019, were entered into evidence through the department's report without objection. More importantly, even if mother were credited for testing on that day, it does not diminish evidence that she did

17.

not comply with the drug testing component of her case plan by regularly submitting to random drug testing. The same line of logic applies to mother's complaint the department disregarded negative drug test results dated November 8, December 12 and December 17, 2019. Even assuming she was credited for those results, it still does not bring her into compliance with the requirement she regularly participate in random drug testing.

Mother further contends the department caused the delay in her obtaining a substance abuse assessment because Lopez did not provide Choices Group a referral. According to the record, however, Choices Group was not waiting for a referral from Lopez; they were waiting for a letter, which Lopez provided. The next step was for mother to make an appointment for an assessment, which she did not do. Consequently, any delay in complying with that component of her case plan was attributable to mother.

*Substantial Probability of Return*

At the 12-month review hearing, the juvenile court may continue the case for up to six months if there is a substantial probability the child will be returned to parental custody within 18 months from the time the child was initially removed. (§ 366.21, subd. (g)(1).) The "substantial probability" of return considers whether the parent consistently and regularly visited the child, made significant and consistent progress in resolving the problems that led to the child's removal from the home, and demonstrated the capacity and ability to complete the objectives of his or her treatment plan and to provide for the child's safety, protection, and physical and emotional well-being. The juvenile court must find evidence of all three to determine there is a substantial probability of return. (§ 366.21, subd. (g)(1)(A)−(B).) Otherwise, the court must terminate reunification services and set a section 366.26 hearing to implement a permanent plan for the child. (§ 366.21, subd. (g)(4).)

Mother objects to the juvenile court's finding she made "minimal" progress. She contends her ability to complete her parenting classes was impeded by the COVID-19

pandemic and she should not be faulted for not drug testing when P.E. was removed from her for failure to provide support—not because she had a substance abuse problem.

Contrary to mother's assertion, there is no evidence she was penalized for any delay caused by the COVID-19 pandemic in completing any of her services. In fact, the court stated that it took the virus into account. (["[T]he court is taking into account the delays necessitated by the COVID virus"].) Further, although mother was not considered compliant with the parenting component of her case plan, that did not appear to be a major concern. She participated in two parenting classes and would complete the program after attending two more classes. Mother's greatest area of noncompliance was drug testing. As a result, the department had no idea whether she had a substance abuse problem. While the court's basis for jurisdiction was mother's failure to provide P.E. support, there was concern from the beginning that she may have a drug problem and the department rightfully included that service in her case plan. By failing to address it for an entire year, mother prevented the court from safely returning P.E. to her custody. On that evidence, the juvenile court could properly find that mother's progress was minimal and, therefore, there was not a substantial probability P.E. could be returned to her custody in the four months remaining before the 18-month review hearing.

We find no error on this record.

## DISPOSITION

The petition for extraordinary writ is denied. This court's opinion is final forthwith as to this court pursuant to rule 8.490(b)(2)(A) of the California Rules of Court.